**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT, EASTERN DIVISION OF ILLINOIS**

| | | |
|---|---|---|
| Valley Entertainment Inc. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action Number:** |
| | ) | **Judge Presiding:** |
| Wendi Friesen - Hypnotist, | ) | |
| and Wendi.com, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

```
FILED: JUNE 17, 2008
08CV3470
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE MASON
TG
```

**Complaint at Law**

NOW COME the Plaintiff, Valley Entertainment, Inc., by and through its attorney Bradley Daniel Birgé, P.C., and complaining of the Defendants,  Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, states as follows:

**Facts Common to All Counts**
**Nature of Case**

1.      Plaintiff, Valley Entertainment, Inc., is a record label and music publishing company which derives most of its income from selling phonorecords (in the form of cds, dvds, digital files, etc.).   Fred Sharpe, a/k/a Raphael ("Raphael") and his recordings "Resurrection,"  "In Paradiso,"  and "Primitive ,"  is a widely recognized artist in the New Age genre.  Defendants have unlawfully copied sound recordings and musical compositions to which Plaintiff has exclusive rights, and have incorporated Plaintiff's songs into Defendants' mass produced compact discs and/or dvds released by Defendants for sale, including the compact discs entitled "Happy Tummy" and "Zen

**Complaint at Law**                                                        Page 1

of Thin Weight."   The total amount of music misappropriated by the Defendants so far detected is 61 minutes. This action seeks full disclosure by Defendants of all music which Defendants have misappropriated from Plaintiff and damages and attorney's fees as a result of Defendants' willful copyright infringement.

### Jurisdiction and Venue

2.    This Court has jurisdiction under 17 U.S.C. §101 et seq., 17 U.S.C. § 501, 17 U.S.C. § 502, 17 U.S.C.§ 505(b) and 28 U.S.C. §§1331, 1332, 1338 and 1367.

3.    Venue in this District is proper under 28 U.S.C. §1391 and 28 U.S.C. §1400 in that a substantial portion of the acts complained of took place in this district as Chicago is the third largest market, and upon information and belief, the Defendants advertise and broadcast on local Chicago radio station WLS-890, program which is designed to promote the sale of the infringing material in the form of compact discs sales throughout the Midwestern states originated from Chicago; further Defendants are and at all times were doing business in this judicial district.

**Parties**

4.      Plaintiff, Valley Entertainment, Inc., is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is actively engaged in the business of selling and licensing master recordings and musical compositions which it either owns or controls.

5.      Upon information and belief, Defendants, Wendi Friesen - Hypnotist, And Wendi.com, Inc.,  and each of them, is an individual and corporations organized in the State of Delaware, respectively, and transact business in this District via Internet and radio broadcasts via a nationwide system, and locally broadcast on WLS890 radio station.  Defendants, Wendi Friesen - Hypnotist, And Wendi.com, Inc. are engaged in the self-help genre, entertainment business which market compact discs which exploited the intellectual property which is controlled or owned by the Plaintiff.

6.      Upon information and belief, Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  and each of them,  claim they wrote and created the intellectual property contained upon the mass produced compact discs titled "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2."

## Factual Background
## Plaintiff's Copyrighted Works

7.    On or about March 6, 1986, composer Raphael wrote an arrangement for the musical composition "In Paradiso," and wrote an original musical compositions titled "Resurrection," and "Primitive Silence." The arrangement and songs, "In Paradiso," "Resurrection," and "Primitive Silence," respectively, were registered with the United States Copyright Office.    A copy of the certificate of copyright registration is attached to this complaint, marked Exhibit "A."

8.    Ultimately, Valley Entertainment, Inc., through its predecessors in interest entered into a Master Recording Licensing Agreement with the original artist which said agreement was one of the assets which was then sold to Valley Entertainment, Inc. in a Record Asset Purchase and Sale Agreement whereby Valley Entertainment purchased the rights to the master recordings of among other songs, "Resurrection," "In Paradiso," and "Primitive Silence" by Raphael.  A copies of the Agreements are attached to this complaint, marked Exhibit "B" and "C."

9.    Upon information and belief, Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  and each of them, mass produced compact discs titled "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2" without attribution or disclosing the nature, source or lack of permission to use the musical composition contained in the compact discs.

10.    At all times relevant, Valley Entertainment Inc. controlled a registered a copyright No. PAO 937-523 (March 6, 1986) ("the Compositions")  for the songs,

**Complaint at Law**

"Resurrection," "In Paradiso," and "Primitive Silence" by Raphael.   A copy of the Registration Certificate is attached as Exhibit A.

11.    On or after April 1, 2008,  Valley Entertainment, Inc. became aware of the copyright infringements of "Resurrection," "In Paradiso," and "Primitive Silence" when Valley was contacted by an admirer of Raphael of the sales by Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  and each of them, of the mass produced compact discs titled "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2" and it was for the first time, to the knowledge of Valley Entertainment, Inc., that the songs "Resurrection," "In Paradiso," and "Primitive Silence" were the original musical composition for Defendants, "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2."

12.    At all relevant times, Valley Entertainment, Inc. had  controlled the exclusive copyrights to the musical compositions "Resurrection," "In Paradiso," and "Primitive Silence," and Valley Entertainment, Inc. owned the Master Recording to said songs as recorded by Raphael.

13.    The Compositions and Master Recordings to "Resurrection," "In Paradiso," and "Primitive Silence" have been one of Plaintiff's commercial assets, accounting for significant revenues.

14.    Valley Entertainment, Inc. is widely known for being the owner of Master Recordings.  As an essential part of its business, this Plaintiff has licensed the rights to

**Complaint at Law**                                                      Page 5

Master Recordings to third parties for various film, television, compilation albums and music sampling uses.

## Defendants' Acts of Copyright Infringement

15.    On or before April 1, 2008, Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  and each of them, commercially released an audio recording albums which included "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2."  The Defendants' recording have continuously been available and are still being sold on the website of Wendi.com, Inc.

16.    The recordings  "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2" are claimed by the Defendants to be the creation of and performed and to be written by Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., or their agents.   The musical compositions contained within the subject recordings are copied directly from Plaintiff's compositions, the songs "Resurrection," "In Paradiso," and "Primitive Silence" and are interpolated and reproduced directly from Plaintiff's Master Recording by Raphael.

17.    The process of interpolating and reproducing the Master Recording, consists of copying and/or transferring portions of a preexisting recording to make a derivative composition.

**Complaint at Law**                                                    Page 6

18.    At all relevant times, Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., knew or should have known that Valley Entertainment, Inc. controlled the exclusive copyright to the Compositions and Valley Entertainment, Inc. owned and controlled the Master Recording of "Resurrection," "In Paradiso," and "Primitive Silence" by Raphael.

19.    Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc. failed or refused to approach Valley Entertainment, Inc. for the purpose of acquiring a license to use Plaintiff's Compositions nor did these Defendants approach Plaintiff, Valley Entertainment, Inc. to copy and reproduce its Master Recording for use in Defendants' recordings, recordings "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2."

20.    No license agreement was ever entered into between Valley Entertainment, Inc. and the Defendants, and at no time were Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc. ever authorized or legally permitted by Valley Entertainment, Inc. or any third party associated with Valley Entertainment, Inc. to copy, reproduce, perform, distribute, or in any way commercially use the Compositions or Master Recordings controlled by Valley Entertainment, Inc.

21.    Nonetheless, Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., knowingly and willfully copied and used the Compositions and Master Recordings in the compact discs without the permission of Valley Entertainment, Inc. and in violation of copyright interests of Valley Entertainment, Inc. and these Defendants, and each of them, published, distributed, sold, transferred, traded, exploited and continue to

**Complaint at Law**                                                                 Page 7

exploit the Plaintiff's copy written material for financial profit without proper compensation to Plaintiff.

22.    Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  had a duty to determine the authenticity of the claimed copyright of material used to produce or create "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2" prior to reproducing,  distributing, or in any way commercially using the songs  "Resurrection," "In Paradiso," and "Primitive Silence."

23.    On information and belief, the written material included in "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2"  for the compact disc's packaging fails to state that "Happy Tummy," "Zen of thin weight release Program, disc 5, track 2" and "Zen of thin weight release Program, disc 6, tracks 1 and 2" contains the songs and Master Recordings of  "Resurrection," "In Paradiso," and "Primitive Silence" or that the songs were used courtesy of Valley Entertainment, Inc. The Master Recordings courtesy of Valley Entertainment, Inc., nor did the written material disclose that the use of the Plaintiff's songs or Master Recordings occurred under a license from Valley Entertainment, Inc.

24.    At all relevant times, Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc. knew that they were never authorized or legally permitted by Valley Entertainment, Inc., or any third party associated with Valley Entertainment, Inc. to

**Complaint at Law**                                                                 Page 8

copy, reproduce, perform, distribute, or in any way commercially use the Compositions controled by Valley Entertainment, Inc. or its Master Recordings.

25.    On information and belief, through the misappropriation and commercial exploitation of the songs, "Resurrection," "In Paradiso," and "Primitive Silence," Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc. have unlawfully and willfully copied, reproduced, performed, distributed, and/or created  derivative works of the Compositions and the Master Recordings in violation of exclusive copyright interests of Valley Entertainment, Inc.

26.    On information and belief, Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  and each of them, have unlawfully and willfully published, distributed, sold, transferred, traded and exploited Plaintiff's Compositions and the Master Recordings in violation of exclusive copyright interests and ownership of Master Recordings of Valley Entertainment, Inc.

**Complaint at Law**                                                     Page 9

**Count I**
**Valley Entertainment, Inc.**
**Federal Copyright Infringement**
**17 U.S.C. §101 et seq.**

27.    Valley Entertainment Publishing and Recovery Co. incorporates herein by reference each and every allegation contained in paragraphs 1 through 26 above in the Facts Common to All Counts, as if fully set forth below.

28.    The unauthorized use by Defendants,  Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, of the Compositions infringes upon the exclusive copyright interests of Valley Entertainment, Inc. pursuant to 17 U.S.C. §101, *et seq.*

29.    Upon information and belief, Defendants,  Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  and each of them, have knowingly caused, participated in, materially contributed to, and derived economic benefit from the infringement of the copyright interests of Valley Entertainment, Inc., and Valley Entertainment, Inc. has been damaged and continues to be damaged thereby.

30.    The aforesaid conduct of the Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  and each of them, has been and continues to be intentional, willful, deliberate, and with full knowledge of the copyright interests of Valley Entertainment, Inc. and the infringement thereof.

31.    The aforesaid acts of Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc.,  and each of them, have caused and will continue to cause damage in an amount to be determined at trial.

**Complaint at Law**                                              Page 10

32.     As a direct and proximate result of the foregoing acts of infringement by Defendants, Valley Entertainment, Inc. is entitled to actual damages and profits under Section 504 of the Copyright Act in an amount to be established at trial.

33.     As a direct and proximate result of the foregoing acts of infringement by Defendants, Valley Entertainment, Inc. is entitled to statutory damages under Section 504 of the Copyright Act for Defendants' willful infringement in an amount to be established at trial.

34.     As a direct and proximate result of the foregoing acts of infringement by Defendants, Valley Entertainment, Inc. is entitled to attorneys' fees and costs of this action under Section 505 of the Copyright Act.

WHEREFORE, Valley Entertainment, Inc. prays this honorable Court to grant the following relief against Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them:

a)     For an award to Valley Entertainment, Inc. at its election, of either:

    (i)     actual damages and all profits derived by Defendants as a result of their infringing activities, pursuant to 17 U.S.C. §504(b), or

    (ii)     statutory damages in the maximum amount of $150,000 with respect to each Defendant for its illegal use of Plaintiffs' copyrighted work registered in the United States, pursuant to 17 U.S.C. §504(c); and

b)     For an award of such damages in an amount sufficient to compensate Plaintiffs for losses they have sustained as a consequence of Defendants' unlawful acts, as well as profits attributable to Defendants' unlawful acts;

c)     For an accounting for all profits derived by Defendants from their unlawful acts;

d)     For an award to Plaintiffs of their attorneys' fees and full costs;

**Complaint at Law**                                                                 Page 11

e)      For an award of treble damages to Plaintiffs; and

f)      For such further relief as the Court may deem just and appropriate.

**Count II**
**Valley Entertainment, Inc.**
**Common Law Copyright Infringement**
**of Master Recording**

35.    Valley Entertainment, Inc. incorporates herein by reference each and every allegation contained in paragraphs 1 through 31 above in the Facts Common to All Counts, as if fully set forth below.

36.    The unauthorized use by Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc. each of them, of the art, science engineering of the Master Recordings infringes on the exclusive common law copyright interests of Valley Entertainment, Inc. which rights are pre-existing and are not pre-empted under 17 U.S.C §101, *et seq*.

37.    Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., Tommy Boy Entertainment L.L.C, and each of them, knowingly caused, participated in, materially contributed to, and derived economic benefit from the infringement of the Master Recordings' common law copyright interests of Valley Entertainment, Inc., and  Valley Entertainment, Inc. has been damaged and continues to be damaged thereby.

38.    The aforesaid conduct of the Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, has been and continues to be intentional, willful, deliberate, and with full knowledge of the Master Recordings' common law copyright interests of Valley Entertainment, Inc. and the infringement thereof.

39.    The aforesaid acts of Defendants, Wendi Friesen - Hypnotist, and

**Complaint at Law**

Wendi.com, Inc., and each of them, have caused and will continue to cause damage in an amount to be determined at trial.

40.    As a direct and proximate result of the foregoing acts of infringement by Defendants, Valley Entertainment, Inc. is entitled to actual damages and profits under common law in an amount to be established at trial.

41.    As a direct and proximate result of the foregoing acts of infringement by Defendants, Valley Entertainment, Inc. is entitled to damages under common law for the Defendants' willful infringement in an amount to be established at trial.

42.    As a direct and proximate result of the foregoing acts of infringement by Defendants, Valley Entertainment, Inc. is entitled to attorneys' fees and costs.

WHEREFORE, Valley Entertainment, Inc. prays this honorable Court to grant the following relief against Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them:

a)    For an award to Valley Entertainment, Inc. of:

(i)    actual damages and all profits derived by Defendants as a result of their infringing activities, and

(ii)    punitive damages in the amount to deter this type of infringement from re-occurring; and

b)    For an award of such damages in an amount sufficient to compensate Plaintiffs for losses they have sustained as a consequence of Defendants' unlawful acts; as well as profits attributable to Defendants' unlawful acts;

c)    For an accounting for all profits derived by Defendants from their unlawful acts;

d)    For an award to Plaintiffs of their attorneys' fees and full costs;

e)    For an award of treble damages to Plaintiffs; and

**Complaint at Law**                                                    Page 13

f)    For such further relief as the Court may deem just and appropriate.

### Count III - *Quantum Meruit*
### Valley Entertainment, Inc.

43.    In the alternative, Plaintiff realleges and incorporates paragraphs 1 through 41 of Count II and incorporates the same herein as paragraph 41 of Count III as if fully set forth below.

44.    Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, have converted, procured, extracted and incorporated the art, science and engineering of the Master Recordings owned by Valley Entertainment, Inc., for the economic, commercial and financial benefit of the Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, but have failed and refused to pay for a license from Valley Entertainment, Inc.

45.    The misappropriation of the common law property rights of Valley Entertainment, Inc. to its Master Recordings benefitted the Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, without paying just compensation in an amount in excess of $75,000.00.

46.    Valley Entertainment, Inc., has protected and enforced its rights to license the Master Recordings of the subject song with the understanding and expectation that it would be paid for the use of its property.

**Complaint at Law**                                            Page 14

WHEREFORE,  Plaintiff, Valley Entertainment, Inc., Inc., prays that judgment be entered against the Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, in an amount in excess of $75,000.00, plus costs.

### Count IV - Unjust Enrichment
### Valley Entertainment, Inc.

47.   In the alternative,  Plaintiff, Valley Entertainment, Inc., realleges and incorporates paragraphs 1 through 46 of Count III and incorporates the same herein as paragraph 47 Count IV as if fully set forth below.

48.     Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, obtained the benefit of the common law property rights to the Master Recordings, but said Defendants have failed and refused to pay for a license from Valley Entertainment, Inc.

49.     It is unjust that Valley Entertainment, Inc., purchased, protected and licensed the common law property rights to the Master Recordings, but that the Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, could exploit financially and commercially without purchasing or paying for a license from Valley Entertainment, Inc.

50.     Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., Tommy Boy Entertainment L.L.C, and each of them, never paid for a license from Valley Entertainment, Inc.

56.     The failure to purchase a license to use the Master Recordings benefitted the Defendants, Wendi Friesen - Hypnotist, and Wendi.com, Inc., and each of them, unjustly benefitted them in an amount in excess of $75,000.00.

## Complaint at Law

the Defendants, Wendi Friesen - Hypnotist, Wendi.com, Inc. and Wendy.com, and

each of them, unjustly benefitted them in an amount in excess of $75,000.00.

WHEREFORE,  Plaintiff, Valley Entertainment, Inc., Inc., prays that judgment be

entered against the Defendants, Wendi Friesen - Hypnotist, Wendi.com, Inc. and

Wendy.com, and each of them, in an amount in excess of $75,000.00, plus costs.

Dated: June 3, 2008                               Respectfully submitted,

Under penalties as provided by law pursuant to Section 5/1-109 of the Code of
Civil Procedure, the undersigned certifies that the statements set forth in this instrument
are true and correct, except as to matters therein stated to be on information and belief
and as to such matters the undersigned certifies as aforesaid that he verily believes the
same to be true.

Signed By: _____  6/13/08
            Valley Entertainment, Inc., by its
            President Jon Birgé

Bradley Daniel Birgé, P.C.
217 North Jefferson Street
Fifth Floor
Chicago, Illinois 60661
Telephone (312) 327-3408
Attorney Number **6194647**

**Complaint at Law**                               Page 16

FROM :                          FAX NO. :              May. 19 2008 01:59PM P1

EXAMINED BY *HEC*                              FORM PA

CHECKED BY

☑ CORRESPONDENCE                               FOR
   Yes                                         COPYRIGHT
                                               OFFICE
☐ DEPOSIT ACCOUNT                              USE
   FUNDS USED                                  ONLY

PAU    937-523

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?  **5**
☐ Yes ☐ No   If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form.
☐ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number** ▼          **Year of Registration** ▼

**DERIVATIVE WORK OR COMPILATION**  Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.  **6**
a. **Preexisting Material**  Identify any preexisting work or works that this work is based on or incorporates. ▼

See instructions
before completing
this space.

b. **Material Added to This Work**  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼    *none*

**DEPOSIT ACCOUNT**  If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.  **7**
Name ▼                              Account Number ▼

**CORRESPONDENCE**  Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/Zip ▼  **8**

*FRED Denton Sharpe*
*Box 2189*
*Monroe NY 10950*

Be sure to
give your
daytime phone
◀ number

Area Code & Telephone Number ▶

**CERTIFICATION\***  I, the undersigned, hereby certify that I am the
Check only one ▼
☑ author
☐ other copyright claimant
☐ owner of exclusive right(s)     *Fred Denton Sharpe*
☐ authorized agent of _____
                        Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this is a published work, this date must be the same as or later than the date of publication given in space 3.
*FRED D. SHARPE*   *Fred Denton Sharpe*                    date ▶ *March 6 1986*

              Handwritten signature (X) ▼  *Fred Denton Sharpe.*

MAIL
CERTIFI-
CATE TO

Name ▼   *FRED SHARPE*
Number/Street/Apartment Number ▼   *BOX 2189*
City/State/Zip ▼   *MONROE NY 10950*

Certificate
will be
mailed in
window
envelope

**9**

Have you:
• Completed all necessary
  spaces?
• Signed your application in space
  8?
• Enclosed check or money order
  for $10 payable to Register of
  Copyrights?
• Enclosed your deposit material
  with the application and fee?

MAIL TO: Register of Copyrights
Library of Congress, Washington,
D.C. 20559.

\* 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in
connection with the application, shall be fined not more than $2,500.
☆U.S. GOVERNMENT PRINTING OFFICE: 1985: 461–584/20,003

July 1985—200,000



EXHIBIT
A

**1**

TITLE OF THIS WORK ▼

*LIFE: a sacred Symphony*

PREVIOUS OR ALTERNATIVE TITLES ▼

*none*

NATURE OF THIS WORK ▼ See instructions

*sacred symphony*

**2**

**a**

NAME OF AUTHOR ▼

*Fred Denton SHARPE*

DATES OF BIRTH AND DEATH
Year Born ▼          Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
Citizen of ▶ _____ *USA*
OR
Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☑ No
Pseudonymous? ☐ Yes ☑ No

If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼

*words and music*

**b**

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼          Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
Citizen of ▶ _____
OR
Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**c**

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼          Year Died ▼

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space

*[handwritten notes, illegible]*

**Valley Entertainment** Master Recording License Agreement Renewal

Whereas Valley Entertainment, Inc. is successor to Valley Entertainment, Inc. entered
Whereas Raphael and Hearts of Space entered

Whereas Raphael and Hearts of Space, as successor to Valley Entertainment, Inc., entered
into an Agreement for an exclusive license of the Master Recording entitled "Music To Disappear
in" as of the date of March 31st, 1988 and said Agreement has expired, and

Whereas Raphael and VE jointly and separately would like to extend the above-mentioned
Agreement for a period ending December 31, 2009 and

Whereas Raphael and Valley Entertainment jointly and separately would like to keep all other
terms and conditions from the Agreement dated March 31st, 1988,the same during the contract
extension.

Therefore, in mutual consideration of the foregoing and of mutual covenants and promises set
forth in the Agreement dated March 31st, 1988, the parties by their signature hereto, bind
themselves to the terms and conditions of said Agreement for the period ending December 31,
2010.

For Raphael                          For Valley Entertainment, Inc :

*Raphael F. Sharpe*                  *[signature]*
                                     Jon Birge

May 20 2008                          5/21/08
Date:                                Date:

---

## CERTIFICATE OF COPYRIGHT REGISTRATION

**FORM PA**
UNITED STATES COPYRIGHT OFFICE

This certificate, issued under the seal of the Copyright
Office in accordance with the provisions of section 410(a)
of title 17, United States Code, attests that copyright reg-
istration has been made for the work identified below. The
information in this certificate has been made a part of the
Copyright Office records.

*[signature]*
REGISTER OF COPYRIGHTS
United States of America

OFFICIAL SEAL

REGISTRATION NUMBER

PAu    937-523

PA    PAU

EFFECTIVE DATE OF REGISTRATION

2 9 DEC 1986
Month    Day    Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.



# MASTER RECORDING
# LICENSING AGREEMENT

**Section 1.  Parties.**  This Agreement is entered into this 31st _ day of March, 1988 by and between, on the one hand, HEARTS OF SPACE RECORDS, INC., a California Corporation located at Post Office Box 31321, San Francisco, California 94131, hereinafter referred to as Hearts of Space; and, on the other, Gene Heimlich and Drew Gorman, Artist's Representatives, individuals located at 888 8th Avenue, #3U, New York, NY 10019, hereinafter referred to collectively as Representative, and Raphael, also known as Fred Sharpe, an individual located at _Box 2189, Monroe, NY 10950_____, hereinafter referred to as Artist.

**Section 2.  Background and Purpose.**

a.  Representative has produced and controls certain rights in and to a Master Recording of performances by Artist, entitled **Music to Disappear In.**  Said Master Recording contains the following pieces of music (hereinafter Compositions):

| Title | Composer/Copyright Holder |
|---|---|
| Disappearing Into You | Raphael |
| In Paradiso | Faure |
| Resurrection | Raphael |
| Silence | Raphael |
| In Paradiso | Faure |
| Silence | Raphael |
| Serpent | Raphael |
| I Say Rock and Roll Prayers To A Dancing God | Gabriel Roth & Otto Richter |
| Puerto Rican Spirit Guides | Raphael |
| Silence | Raphael |

b.  Representative desires to license certain rights pertaining to the exploitation of said Master Recording and Compositions.  Hearts of Space desires to obtain the license to certain rights to that Master Recording and Compositions.  The purpose of this Agreement is to set forth the terms and conditions by which Representative, on its own behalf and on behalf of Artist, with Artist's full knowledge and consent, grants to Hearts of Space the sole and exclusive right to exploit the Master Recording of the Compositions by, including without limitation, manufacturing, distributing, and marketing Phonorecords of the musical compositions contained in the Master Recording, and licensing others to manufacture, distribute, and market said Phonorecords.



**EXHIBIT
B**

### Section 3.  Definitions.

a.  "Master Recording" shall be defined as the original, fully edited and mixed recordings (whether on magnetic recording tape, lacquer, or any other substance or material now known or that may become known) suitable for use to manufacture Phonorecords, of no less than forty (40) and no more than sixty (60) minutes of playing time.

b.  "Phonorecords" shall be defined as all forms of audio recording and reproductions now known or that may become known, manufactured, and sold or transmitted, including, without limitation, phonograph records, magnetic record tape in cartridges or otherwise, compact discs, sound cards, and any other medium or device used to reproduce, broadcast, or transmit Artist's Composition and performances including film, video, videodiscs, and video cassettes.

### Section 4.  Master Recording.

a.  Representative shall deliver to Hearts of Space, no later than thirty (30) days after the signing of this Agreement, the Master Recording of the Compositions that in the sole opinion of Hearts of Space is suitable as an original recording for the manufacture of technically and commercially satisfactory Phonorecords and audio-visual devices.  Said Master Recording shall be the original Dolby encoded master.

b.  All expenses necessary for and incurred in the production of the Master Recording have been and shall be the responsibility of Representative.

c.  In the event that Hearts of Space invests any additional money in the production of the Master Recording, including but not limited to expenses incurred in mixing or re-mixing, sequencing, or other production activities, said expenses shall be recoupable from Representative's royalties payable under this Agreement.  Hearts of Space shall consult with Representative before incurring recoupable expenses exceeding five hundred dollars ($500.00).  Mastering expenses shall not be recoupable from royalties payable hereunder.

d.  The Master Recording shall remain in the possession and control of Hearts of Space during the term of this Agreement, and Hearts of Space shall not be responsible for any damage to or the loss of the Master Recording.  The Master Recording shall remain the property of Representative and shall be returned to him at the termination of this Agreement.

### Section 5.  Grant of Rights.

a.  Representative grants to Hearts of Space the sole and exclusive worldwide right, subject only to Section 5.a.(1) and 5.a.(2) below, to make and distribute, or license others to make and distribute, copies of the Master Recording of the Composition, in the form of Phonorecords, and to advertise, market, and sell those Phonorecords throughout the world.

(1)  Hearts of Space acknowledges that, prior to negotiating and entering into this Agreement with Hearts of Space, Representative may have developed contacts for possible licensing of the Master Recording in Europe.  Therefore, Hearts of Space agrees that in the event Representative is able to conclude an agreement for licensing in Europe to an entity contacted before granting the present license to Hearts of Space, Representative shall be entitled to enter into such an agreement, and Hearts of Space shall not be entitled to any compensation from income derived from the license granted that entity if the following conditions are met: (i)  the licensing entity commits to licensing without having seen any material produced by Hearts of Space, including but not limited to having met with any employee, agent, or representative of Hearts of Space, and (ii) Hearts of Space is not involved in any way in any negotiation of the licensing agreement.

(2)  Concurrent with the signing of this Agreement, Representative shall list on Appendix B attached hereto, "Representative's Prior Contacts for Licencing in Europe," all prospective licensors contacted by Representative prior to completing this Agreement.  Representative shall indicate on said Appendix B whether Hearts of Space is to make any contact with said prospective licensing entity.  In the event that Representative instructs Hearts of Space to make any contact with any prospective licensing entity listed in Appendix B, and if as a result of any such contact, either oral or written, that prospective licensing entity enters into a license agreement with Hearts of Space, Hearts of Space shall be entitled to full compensation as set forth in this Agreement, despite the fact that Representative originated the contact with the licensing entity.  To avoid possible conflicts or waste of efforts, Representative and Hearts of Space agree to keep each other informed of their respective prospects and negotiations for European licensing.

   b.  Representative grants to Hearts of Space the right to use and to allow others to use Artist's name, likeness, and biographical material for advertising and purposes of trade, in connection with the sales and marketing of the Master Recording and Phonorecord copies of it, in a manner consistent with Artist's reputation and musical style.

   c.  Representative grants to Hearts of Space the exclusive right, with the prior written permission of Representative, to make and publish new adaptations, arrangements, and edited versions of the Master Recording and its contents.

   d.  Representative grants to Hearts of Space the exclusive right to make, and license others to make, excerpts from the Master Recording for use in compilations (and any other aggregation Hearts of Space deems appropriate).  Any compilation or aggregation for which excerpts from the Master Recording are licensed shall not be inconsistent with Artist's, Representative's, and Hearts of Space's reputation, image, and musical style.

   e.  Representative grants to Hearts of Space the right to permit public performances of the Master Recording and any reproductions thereof.

   f.  Representative grants to Hearts of Space the sole and exclusive right to use, control, and exploit the Master Recording and all other reproductions and subsequent adaptations of and excerpts from it in any way Hearts of Space decides is appropriate.  The copyrights and property

rights in the Master Recording, Controlled Compositions contained in it, and artwork and promotional and manufacturing materials generated for Phonorecords shall be handled as follows:

(1)   Concurrent with the signing of this Agreement, Representative agrees to execute the "Transfer Agreement" attached hereto as Appendix A. Pursuant to said "Transfer Agreement," Representative represents, warrants, and agrees that the Master Recording, together with the performances on the Master Recording and all copyrights therein, shall be transferred to Hearts of Space or its designee for the term of this Agreement, free of any claims by Representative, Artist, or any other person, firm, or corporation.   Hearts of Space shall have the right to register said "Transfer Agreement" with the U.S. Copyright Office.   Hearts of Space shall have the right to place Hearts of Space's copyright notice on the cover, packaging, and album label of Phonorecords of the Master Recordings during the term of this Agreement.   At the conclusion of the term of this Agreement, Hearts of Space agrees to transfer back to Representative all rights granted in this paragraph.

(2)   Duplicate masters, metal matrix parts, other devices used to manufacture Phonorecords, and all packaging, artwork, graphics, and other visual materials prepared by Hearts of Space for packaging, marketing, promoting, and advertising the Phonorecords will be and shall remain the property of Hearts of Space, including copyrights.

(3)   The copyrights in controlled compositions contained on the Master Recording shall be registered in the Representative's name.

g.   As the majority of Compositions contained in the Master Recording are owned, controlled, or administered by Representative, then Representative grants to Hearts of Space a mechanical license to make and distribute Phonorecords, and a synchronization and performance license to make and distribute audio-visual devices embodying those Compositions or any part of them.   Representative warrants that the copyrightholder agrees to the foregoing mechanical, synchronization, and performances licenses.

**Representative's Initials** ⸺

h.   Representative grants to Hearts of Space the sole and exclusive right to grant to third parties synchronization licenses for the use of the Master Recording in motion pictures, television programs, and all other audio-visual media now known or that may become known.   Any synchronization licenses which Hearts of Space grants to third parties shall be for uses or products which are not inconsistent with Artist's, Representative's, and Hearts of Space's reputation, image, and musical style.   Hearts of Space shall not unreasonably withhold consent to reasonable offers for synchronization licenses.

i.   Hearts of Space shall have the right to determine in its sole discretion the manner and means of exploiting and deriving income from the Master Recording, and all materials and means, including text and graphics, used to manufacture, package, present, advertise, market, and promote the Phonorecords.   Hearts of Space shall consult with Representative regarding cover art.

j.  Representative grants to Hearts of Space the right to use Representative's name and Representative's company name and logo in connection with the sales and marketing of the Master Recording and Phonorecords. Hearts of Space shall include Representative's company's name and logo on all Phonorecords manufactured and sold, in accordance with the following terms and conditions:

(1)  Representative shall provide to Hearts of Space, within thirty (30) days of signing this Agreement, artwork of Representative's logo that in the sole opinion of Hearts of Space is technically appropriate for inclusion in album artwork.  Representative's logo shall not be inconsistent with Hearts of Space's reputation and image. Representative's logo shall be placed on that section of the Phonorecords that Hearts of Space customarily uses for production credits and copyright and performance right notification, in a size and prominence appropriate to each format and consistent with industry practice.

(2)  Representative warrants that he owns or controls the right to use the name, logo, trademark, and servicemark of his production company, and Representative agrees to indemnify and hold harmless Hearts of Space against any and all claims by third parties arising out of the use of Representative's name logo, trademark, or servicemark or this warranty.

**Section 6.  Expenses to Manufacture Phonorecords.**  Expenses incurred by Hearts of Space in the production and manufacturing of Phonorecords, including but not limited to labels, inserts, graphic design, etc., shall be borne by Hearts of Space and shall not be recoupable from Representative's royalties, except as provided in Section 8.a.(1) of this Agreement.

**Section 7.  Mechanical License Fee.**  The mechanical license fee per controlled composition payable on the sale of Phonorecords containing the Compositions shall be seventy-five percent (75%) of the statutory compulsory mechanical license fee under the United States Copyright Act in effect on the date that Phonorecords are released for sale.  No mechanical license fees shall be payable for Controlled Compositions that are arrangements of selections in the public domain.

**Section 8.  Representative's Royalties.**

a.  **Basic Domestic Royalty on Standard Sales Made by Hearts of Space.**

(1)  **Cassettes, LPs, and Compact Discs.**  The basic Representative's royalty on domestic sales made by Hearts of Space of cassettes and LPs shall be fifteen percent (15%) of the price paid by the distributor on one hundred percent (100%) of net sales, exclusive of free goods, after deducting a packaging fee of fifteen percent (15%) of the distributor's price for cassettes and LPs, and twenty-five percent (25%) for compact discs.  "Net sales" shall mean the aggregate number of Phonorecords sold and for which Hearts of Space has been paid, after deducting returns, rebates, credits, cancellations, and exchanges.

**(2)  Other Formats.**  Representative and Hearts of Space agree to enter into good faith negotiations regarding Representative's royalties on sales in audio or video formats not specified in paragraph 8.a.(1) above.

**b.  Discount Sales and Sales through Third-Party Agreement(s).**  One half of the basic domestic royalty rate stated in Section 8.a.(1) shall be paid on the sale of Phonorecords at mid-line or budget price and on the licensing of the Master Recording for distribution through a third party, such as but not limited to major label branch distribution.  If royalties paid to Hearts of Space under any agreement(s) with third parties are computed on a basis of less than one hundred percent (100%) of net sales, Representative's royalties will also be based on that lower figure or reduced in a pro rata manner.

**c.  Foreign Exchange.**  Royalties from foreign sales will be converted to United States currency using the foreign exchange rate existing when the funds are received by Hearts of Space.

**d.  Flat Fees.**  For any licensing of the Master Recording on a flat fee basis, the net income for such licensing shall be shared equally between Representative and Hearts of Space.  "Net income" shall mean, here and throughout this Agreement, payments received less direct expenses incurred to generate said payments, including but not limited to legal and consulting fees for negotiation of separate agreements, preparation of duplicate or additional artwork, films, or master tapes, etc.

**e.  Royalties on Compilations.**

(1) If Hearts of Space couples the Composition or excerpts or adaptations thereof with other royalty bearing musical compositions, then Representative's royalty on such a compilation shall be a proportionate fraction of the royalties described in Section 8.a.(1) above, with the duration of Representative's music in the numerator over the total playing time of the compilation in the denominator.

(2) If Hearts of Space licenses a third party to couple the Composition or excerpts of adaptations thereof with other royalty bearing musical compositions, then Representative's royalty on such a compilation shall be fifty percent (50%) of the net income received from such license.

**f.  Royalties on Synchronization Licenses.**  One half (1/2) of the net income received by Hearts of Space as a fee for synchronization rights for all or any part of the Composition shall be payable to Representative.

**g.  Transactions Exempt from Representative's Royalties.**  No royalties shall be payable on Phonorecords or audio-visual devices distributed as promotional copies, "free goods," or sold at or below cost, such as cut-outs or scrap, or at a price that is fifty percent (50%) or more below the regular distributor price charged by Hearts of Space, or sold to Representative or Artist.

**h.  Statements and Payments.**  Hearts of Space shall provide Representative with statements of account and payment of royalties due twice each year, for the period ending June 30 and December 31, within sixty (60) days after June 30 and December 31.

**i.  Reserves.**  During each accounting period, Hearts of Space may withhold reasonable reserves against returns.  Such reserves, if any, shall not exceed thirty percent (30%) of royalties payable and shall be liquidated after the second accounting period from the time the reserve is established.

**j.  Cross-collateralization.**  Hearts of Space may deduct from any sums due Representative or Artist any amount that Representative or Artist may owe to Hearts of Space.  No royalties shall be payable under this Agreement, or under any other recording agreement or master recording licensing agreement between Representative or Artist and Hearts of Space, until Hearts of Space has recouped from royalties payable under this Agreement, or under any other agreement between Representative or Artist and Hearts of Space, a sum equal to all of its advances and recording, production, and delivery costs for the Master Recording covered by this Agreement or any other agreement between Representative or Artist and Hearts of Space.

**k.  Right to Inspect Books.**  At any time within two (2) years after a royalty statement is submitted to Representative by Hearts of Space, Representative or his authorized representative shall have the right, upon written request, to audit the books and records of Hearts of Space, but only with respect to statements and payments hereunder.  Audits shall occur at times mutually agreed upon, during regular business hours at the regular business address of Hearts of Space.  Representative may conduct an audit no more than once during any calendar year.  Any failure by Representative to give written notice of objection within the two (2) year period from the date of the statements and payments shall bar any further objections by Representative.  Representative, in that circumstance, shall be foreclosed from maintaining any action, claim, or proceeding against Hearts of Space on those statements and payments.

**l.  Royalties Payable to Third Parties.**  The sums to be paid to Representative by Hearts of Space under this Agreement include all royalties of the Representative and Artist.  Representative shall pay, without any cost or expense to Hearts of Space, any or all royalties that may be or become due to claiming artists or other participants in the Master Recordings, with the exception of mechanical royalties due and payable on the controlled composition "Disappearing Into You."

**Section 9.  Representative's Receipt of Gratis Copies of Phonorecords.**  Upon commercial release of Phonorecords of the Master Recording, Hearts of Space shall deliver to Representative fifty (50) free copies each of LPs and cassettes and ten (10) free copies of compact discs.

**Section 10.  Representative's and/or Artist's Purchase of Phonorecords.**  Hearts of Space shall, at any time, sell Phonorecords to Artist or Representative, for Artist's or Representative's unrestricted retail sale,

at a price equal to Hearts of Space's regular price to distributors, less Artist's royalty, plus cost of shipping to Artist or Representative, if any.  No royalty shall be payable on such sales.

**Section 11.  Agreement not to Re-record Compositions.**  Representative and Artist agree not to re-record the Compositions included on the Master Recording, or any portion or adaptation thereof, without the prior written consent of Hearts of Space for a period of five (5) years from the date of Hearts of Space's first release of Phonorecords of the Master Recording or three (3) years from the termination or expiration of the term of this Agreement, whichever is greater.

**Section 12.  Effective Date, Term, Renewal, Maintenance, and Expiration.**

a.  This Agreement shall not be effective until signed by an authorized representative of Hearts of Space.

b.  The term of this Agreement shall be for a period of fourteen (14) years from the date this Agreement is signed by an authorized representative of Hearts of Space.  Hearts of Space agrees to maintain commercial availability of Phonorecords of the Master Recording.  In the event Hearts of Space allows said Phonorecords to go out of print in all formats for more than eighteen (18) consecutive months, or if Hearts of Space ceases to do business, and the situation is not covered by Section 16 below, then all rights to exploit the Compositions and the Master Recording revert to Representative.

c.  Representative and Hearts of Space agree that Hearts of Space shall have the exclusive right of first refusal to renew this Agreement under the following procedure:

(1) For ninety (90) days preceding the expiration of the term of this Agreement, Representative shall not negotiate with any third party concerning the grant, sale, assignment, license, or other transfer rights to the Master Recording.  Until the expiration of that ninety (90) day period, Representative agrees to first negotiate in good faith with Hearts of Space and to exert his best efforts to reach an agreement with Hearts of space for Hearts of Space's renewal of the Agreement.

(2) In the event Representative and Hearts of Space fail to reach an agreement by the end of that ninety (90) day period, Representative shall be free to negotiate with third parties for grant, sale, assignment, license, or other transfer of rights to the Master Recording, but only for terms and conditions more favorable to Representative than those offered by Hearts of Space.  If Representative receives a bona fide offer from a bona fide third party, Representative shall notify Hearts of Space in writing of the terms of that offer and Hearts of Space shall have then (10) days from receipt of that notice to notify Representative, in writing, that it wants to meet the terms and conditions of that offer.  In the event Hearts of Space gives Representative that notice, then the right to renew automatically shall vest with Hearts of Space, and Representative shall enter into a written agreement with Hearts of Space reflecting those

terms and conditions, promptly after Representative's receipt of that notice. In the event Hearts of Space does not give Representative that notice, Representative shall be free to finalize negotiations with the aforementioned third party.

d. At the conclusion of the term, all pressing by Hearts of Space shall cease, and Hearts of Space shall not manufacture any further Phonorecords from the Master Recording. During the last six (6) months of this Agreement, Hearts of Space shall manufacture only those quantities of Phonorecords that meet anticipated current demand, thereby precluding an excessive inventory build-up immediately before the expiration of this Agreement. Within thirty (30) days of the expiration or termination date, Hearts of Space will submit to Representative a written inventory containing the manufacturing costs of all then-remaining Phonorecords. Representative shall have the right to purchase all or part of such inventory, upon giving Hearts of Space written notice of its election to do so after its receipt of such written inventory. Representative's price for such a purchase shall be an amount equal to Hearts of Space's costs of manufacturing. In its sole discretion, Hearts of Space may require payment on delivery (C. O. D.), in which case Hearts of Space shall so notify Representative before shipment of inventory, or may deduct the price of purchase from royalties or other sums, if any, payable to Representative.

e. Upon expiration of this Agreement by reason of passage of time and not by reason of termination by Representative, and provided that Hearts of Space submits the aforementioned inventory to Representative, Hearts of Space shall have the right to sell at full price, on a non-exclusive basis, with royalties payable, the remaining Phonorecords for a period of six (6) months following expiration of the Agreement or until Representative elects to purchase the said Phonorecords.

f. The provisions of this Agreement concerning compensation, accounting, audits, ownership of the Master Recording, the rights of Hearts of Space to use Artist's name, likeness, and biographical material, the restrictions upon Artist's re-recording, and Representative's warranties and indemnities shall survive the expiration or termination of this Agreement.

g. If Artist's performance ability becomes impaired, or Artist ceases to pursue his career, or fails to perform obligations under this Agreement, Hearts of Space may elect to terminate this Agreement, which will relieve it of any further obligations to Representative or Artist except payment of accrued royalties to the extent that costs and advances have been recouped.

**Section 13. Right of First Option for Artist's Next Recording.**

a. Representative agrees to grant Hearts of Space an irrevocable right of first option and last refusal to exploit Artist's next master recording in a style and idiom appropriate to the Hearts of Space label under terms and conditions to be determined in good faith negotiations.

b. Should Representative and Hearts of Space fail to reach an agreement within ninety (90) days of Representative's submission to Hearts of Space of said master recording, Representative shall be free to

negotiate with third parties, but only for terms and conditions more favorable to Artist and Representative than those offered by Hearts of Space. In the event that Representative receives a bona fide offer from a bona fide third party, Representative shall notify Hearts of Space in writing of the terms of that offer and Hearts of Space shall have ten (10) days from its receipt to notify Representative in writing that it wants to meet the terms and conditions of that offer. In the event Hearts of Space gives Representative that notice, then the right to license said master recording under said terms and conditions shall vest with Hearts of Space, and Representative shall enter into a written agreement with Hearts of Space reflecting those terms and conditions promptly after Representative's receipt of that notice. In the event Hearts of Space does not give Representative that notice, Representative shall be free to finalize negotiations with the aforementioned third party.

## Section 14.  Representative's warranties.

a.  Representative warrants that he is free to enter into and perform this Agreement and is not and will not be under any disability or restriction, contractual or otherwise, with respect to the commitments made by him under this Agreement. Representative further warrants that none of the Master Recording recorded under this Agreement, its contents, including the Composition, or Hearts of Space's exploitation of the Master Recording shall interfere or infringe under common law or statutory law with the rights of any other party, including without limitation contract rights, copyrights, and rights of publicity and privacy. Representative warrants that he has not assigned or pledged the Master Recording or any part of it, or pledged or authorized any third party the right to distribute Phonorecords derived from the Master Recordings, except for the synchronization licenses granted prior to concluding this Agreement, which Representative shall, concurrent with the signing of this Agreement, list in Appendix C attached hereto, "Representative's Prior Grants of Synchronization Licenses."

b.  Representative warrants that he is under no restriction with respect to the Compositions recorded under this Agreement based on any previous recording contracts or other agreements between Representative or Artist and any other party. Representative further warrants that he or Artist has obtained all permissions, rights, and authorizations necessary and needed from all persons involved in the recording and production of the Master Recording to enable and insure Hearts of Space's exercise and enjoyment of the full scope of rights granted to Hearts of Space by this Agreement. Representative warrants that he has paid all costs incurred in the creation of the Master Recordings, including but not limited to musicians, studio expenses, masterings, etc.

c.  Each of the persons signing this agreement on behalf of Artist warrants that he has the authority to make the commitments entered into by Artist under this Agreement.

d.  Representative's and Artist's representations and warranties are true as of the date of this Agreement and shall remain true for as long as Hearts of Space and its licensees and assigns have any interests or rights under this Agreement.

**Section 15.   Representative's and Artist's Indemnification of Hearts of Space.**

a.   Representative and Artist agree to indemnify, save, and hold harmless Hearts of Space from any costs, expenses, attorney's fees, losses or damages arising out of or connected with any claim by any third party that is inconsistent with any of the warranties or representations made by Representative in this Agreement and any breach by Representative of this Agreement or any other representations or warranties made in this Agreement.

b.   Representative will reimburse Hearts of Space on demand for any payment made by Hearts of Space arising out of the foregoing indemnity. Hearts of Space may also recoup such payments from accrued royalties due Representative under this Agreement.   Unless Representative posts a bond acceptable to Hearts of Space in the amount of the claim and reasonable attorneys' fees and costs, Hearts of Space may place a freeze on the payment of such royalties pending the resolution of such claim or breach. Such freeze shall be in an amount reasonably related to the amount of the claim and attorneys' fees and costs.

c.   Representative and Artist agree that Hearts of Space at its own expense may take such actions as it deems necessary, either in Representative's name, Artist's name, or in the name of Hearts of Space, against any person who uses the Master Recording, Composition, or Artist's performance, name, or likeness in violation of Hearts of Space's rights under this Agreement.   Artist and Representative will cooperate with Hearts of Space in such actions.

**Section 16.   Suspension of Agreement by Hearts of Space.**   If the performance of Hearts of Space's or Representative's obligations under this Agreement is delayed or becomes impossible or impracticable because of any act of God, fire, earthquake, strike, labor disturbance, delay in the delivery of materials and supplies, or other causes beyond their respective control, then Hearts of Space may suspend this Agreement for the duration of such event.   The duration of any such suspension shall be added to the term of this Agreement.

**Section 17.   Notice of failure to perform.**   Failure by either party to perform any of its material obligations under this Agreement shall not be a breach unless the complaining party gives the allegedly breaching party written notice of the failure to perform and the failure is not corrected within thirty (30) days from the date of that notice, or, if the breach cannot reasonably be cured within that period of thirty (30) days, the allegedly breaching party fails to proceed with reasonable diligence to complete the curing of the breach.

**Section 18.   Waiver, amendment, or modification.**

a.   The waiver, amendment or modification of any provision of this Agreement, or of any right, power, or remedy hereunder, shall not be effective unless in writing and signed by both parties.

b. No failure or delay by any party in exercising its respective right, power, or remedy with respect to any of the provision of this Agreement shall operate as a waiver.

**Section 19. Notice and Communication.** Any notice or other communication required or permitted under this Agreement shall be in writing, shall be deemed to have been given or made, and shall be deemed sufficient in all respects when delivered personally or when placed in the United States mail, postage prepaid, and sent to the address of the parties set forth on the signature page to this Agreement or at such other address as shall be given by either party to the other in writing.

**Section 20. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with regard to its subject matter and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties, and there are no warranties, representations, and/or agreements among the parties in connection with the subject matter except as specifically set forth and referred to in this Agreement.

**Section 21. Binding Agreement, Successors and Assigns.** All the terms and provisions of this Agreement shall be binding upon and for the benefit of the parties and their successors, assigns, and legal representatives. Representative may not assign or otherwise transfer responsibilities under this Agreement without the prior written consent of Hearts of Space. Representative may assign this Agreement wo a corporation directed and owned by Representative.

**Section 22. Adjudication and Resolution of Disputes.**

a. The validity, construction, and performance of this Agreement and the legal relations among the parties to this Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding that body of law applicable to choice of law. Both parties agree to be subject to the in personam jurisdiction of the California courts of San Francisco.

b. In the event any provision of this Agreement or the application of any such provision shall be held by a tribunal of competent jurisdiction to be contrary to law, the remaining provisions of this Agreement shall remain in full force and effect.

c. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled in arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof.

d. If any legal action, arbitration, or any other proceeding is brought for the interpretation or enforcement of this Agreement because of any alleged dispute, breach, default, or misrepresentation in connection with any provision of this Agreement, the prevailing party shall be

entitled to recover from the other party the prevailing party's reasonable attorneys' and accounting fees and costs incurred in such proceeding, together with such other relief to which the prevailing party may be entitled.

**Section 23.  No Partnership Created.**  This Agreement does not create a partnership between the parties or any other form of legal association that would impose liability upon one party for the act or failure to act of another party.

**Section 24.  Representative's Counsel.**  Representative acknowledges that Hearts of Space urged Representative to retain counsel to review this Agreement, to advise Representative concerning the terms of this Agreement, and, if appropriate, to negotiate with Hearts of Space on behalf of Representative concerning the terms of this Agreement. Representative agrees that he will perform his responsibility to obtain appropriate legal advice.

**The parties have read the foregoing and agree to be bound by it as of the date set out below, and in witness thereof have executed this Agreement.**

| REPRESENTATIVE | HEARTS OF SPACE RECORDS, INC. |
|---|---|
| *Sene Hamlich* | By *S. R. Siu* |
| Signature | Its (title) *Vice President* |
| *888 8th Ave* | *1634 8 Avenue* |
| Address | Address |
| *nyc. NY. 10019* | *San Francisco, CA 94122* |
| City/State/Zip Code | City/State/Zip |
| *[signature]* | *April 20, 1988* |
| Signature | Date |
| *30 Main St* | |
| Address | |
| *Hastings N.Y.    10706* | |
| City/State/Zip Code | |
| *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* | |
| Representative's Tax ID Number | |

ARTIST

*Raymond Fred Skye*
Signature

*4  13  1988*
Date

# Appendix A
## TRANSFER AGREEMENT

The undersigned Gene Heimlich and Drew Gorman, hereinafter referred to as Representative, and the undersigned Raphael, also known as Fred Sharpe, hereinafter referred to as Artist, for good and valuable consideration, the receipt of which is hereby acknowledged, grants to Hearts of Space Records, Inc. the exclusive right, as limited by the Master Recording Licensing Agreement between Hearts of Space Records, Inc., and Gene Heimlich and Drew Gordon, and Raphael, also known as Fred Sharpe, dated March ____, 1988, to commercially exploit and market the Master Recording identified below, including the transfer of the copyright in that sound recording for the term of that Agreement.

| Title | Artist |
|-------|--------|
| Disappearing Into You | Raphael |
| In Paradiso | Raphael |
| Resurrection | Raphael |
| Silence | Raphael |
| In Paradiso | Raphael |
| Silence | Raphael |
| I Say Rock and Roll Prayers to a Dancing God | Raphael |
| Puerto Rican Spirit Guides | Raphael |
| Silence | Raphael |

IN WITNESS THEREOF, the undersigned have set their hands this _31st_ day of March, 1988.

_____
Gene Heimlich

_____
Drew Gorman

_____
Raphael, also known as Fred Sharpe

Page 14

# Appendix B

# REPRESENTATIVE'S PRIOR CONTACTS FOR LICENSING IN EUROPE

# Appendix C
# REPRESENTATIVE'S PRIOR GRANTS
# OF SYNCHRONIZATION LICENSES

# RECORDS ASSET PURCHASE

# AND SALE AGREEMENT

This Records Asset Purchase and Sale Agreement ("Agreement' hereafter) is made this _6ª_ day of September, 2001 by and between Hearts of Space, Inc., a California Corporation ("HOS" hereafter) and Valley Entertainment Inc., a Delaware Corporation ("VE" hereafter).

# RECITALS

**A.** HOS is engaged in the worldwide business of exploiting, and licensing others to exploit, Master Recordings which HOS has come either (i) to own, or (ii) to control by license from Licensors and Artists or by "work for hire" agreements with Artists and Producers. HOS's exploitation of said Master Recordings mainly takes the form of producing, distributing (primarily through distributors and subdistributors), selling, and marketing Phonorecords replicated from said Master Recordings, also sublicensing replication and other exploitation rights to third parties and otherwise exploiting its Master Recordings ("Master Recordings" hereafter) of music performed by artists ("Artists") and released by HOS with such Artist's consent, as evidenced by related and below defined Artists' Agreements.

**B.** VE desires to purchase HOS' Master Recordings and related rights, all as described in Section 1 below ("Assets" hereafter) and assume HOS' obligations under its related distribution agreements with its distributors and its related license and/or sublicense agreements with Artists, Licensors, and Licensees, and HOS is willing to sell, assign and delegate the same to VE, all on the following terms and conditions.

rev. 9/4/01

**EXHIBIT**

**C**

# AGREEMENT

**1.**    **Definitions**.  The following definitions have the following meanings throughout this Agreement:

(**a**). **Master Recording.** The term "Master Recording" means an original, fully edited and mixed sound recording or portion thereof (whether on magnetic recording tape, digital media, or any other substance or material now known or that may become known) containing an Artists' performance of a single composition or an album-length medley or compilation of compositions, which is used or useable to produce, replicate, manufacture, or exploit Phonorecords.

(**b**).  **HOS Master Recording**.  The term "HOS Master Recording" means each Master Recording listed on the attached Exhibits A-1 and A-2, the rights to which VE is acquiring from HOS under the terms of this Agreement. All of the HOS Master Recordings owned or controlled by HOS are listed in the attached Exhibit A-1.   HOS is agreeing herein to convey to VE all of HOS' rights in and to such Exhibit A-2 deleted HOS Master Recordings AS IS, and without any ~~warranties or representations whatsoever.~~

(**c**). **Phonorecord.** The term "Phonorecord" means all forms or formats of audio recording, reproduction, transmission, or transfer now known or hereafter known or developed, including without limitation phonograph records, magnetic recording tape in cartridges, cassettes, or otherwise, compact discs, sound cards, digital audio tape, digital transmission files compressed or otherwise, existing and yet to be invented computer, online and multimedia formats.

(**d**).  **Record Device**.   The term "Record Device" refers to a subset of Phonorecords including and limited to commercially manufactured physical replication such as but not limited to compact discs (also referred to as "CDs") and cassette tapes.

(**e**).  **New Recording.**  "New Recording" means a Master Recording made or released by or at the request of VE on or after the Closing Date hereof and marketed under the name "Hearts of Space" or any other name which VE is licensed by HOS to use in connection with the marketing or exploitation of Phonorecords.

2

**2.** **Sale of Assets**. HOS hereby agrees to sell, transfer and assign to VE each and all of the Assets set forth in the following Subsection 2(a), subject to the matters set forth in the following Subsection 2(b).

**(a).** **Assets Sold**. The following are the Assets which HOS is agreeing hereunder to sell to VE:

**(i).** **HOS Master Recordings**. All of HOS' rights in and to each of the HOS Master Recordings.

**(ii).** **Inventory**. All of HOS's rights in and to its existing manufactured stock of (i) Record Devices derived from HOS Master Recordings, and (ii) printed parts (CD booklets, folders, and inserts, and cassette J-cards), located at Cinram (HOS's manufacturer and fulfillment provider) and in the hands of DNA, other distributors, subdistributors or dealers. Expressly excluded from this Section 2(a)(ii) are all Record Devices derived from HOS Master Recordings and which are in HOS's possession in Sausalito as of the Closing Date and which HOS' current management estimates will number approximately 5,000 units on the Closing Date. HOS shall have the right, after the Closing Date, to use such approximately 5,000 Record Devices itself, or to sell some or all of them to purchasers other than wholesale or retail accounts and to retain all the consideration generated by each such sale.

**(iii).** **Agreements with Artists, Licensors, and Licensees, including Mechanical License Agreements**. All of HOS' rights in, to or created or evidenced by any and all of the following agreements, including all amendments thereto, to the fullest extent permitted by such agreements, as the same may be amended and provided to VE by the date of this Agreement, subject to the limitations and exceptions set forth in Subsection 2(b) below:

**(A).** **Artist Agreements.** All Agreements with all artists whose performances are contained on any of the HOS Master Recordings ("Artists' Agreements");

**(B).** **Producer and Licensor Agreements.** All Agreements with all Producers and Licensors whose sound recordings are contained in any of the HOS Master Recordings;

**(C).** **Agreements with composers, publishers, subpublishers, and publishing administrators**. All Agreements with all composers, publishers, subpublishers, and

3                                                                rev. 9/4/01

publishing administrators whose musical compositions are contained on any of the HOS Master Recordings and who have issued Mechanical Licenses to HOS; and

(D). **License Agreements.**  All Agreements with all licensees to whom HOS has licensed or sublicensed use or exploitation rights in or to any of the HOS Master Recordings.

(E).  **Artwork.** All of HOS's rights in and to all of the following ("Artwork" hereafter): All photographs, negatives, photographic plates, images, illustrations, text, copy, and graphics, whether in the form of lithographic films or other production materials, digital files, or printed copies, comprising all covers, liners, textual, advertising, point of purchase and promotional materials which are related to the HOS Master Recordings. Notwithstanding the provisions of the immediately preceding sentence, the term "Artwork" does not include any logos or other similar or dissimilar graphic depictions of any trademarks.

(F).  **Distribution Agreement Rights.**  All of HOS's rights under distribution agreements with distributors of HOS's Record Devices derived from HOS Master Recordings, including HOS's rights under that certain Distribution Agreement ("DNA Distribution Agreement" hereafter) dated January 1, 2001 with DNA, a Division of Valley Media, Inc., a Delaware Corporation ("Valley").  Notwithstanding the foregoing, there is hereby reserved to HOS and expressly excluded from the foregoing rights transferred to VE as described in this Subsection 2(a)(iii)(F) all of HOS's rights against Koch International LP and others under that certain distribution agreement dated as of December 8, 1998, which distribution agreement ("Koch Agreement" hereafter) has been terminated and does not authorize anyone to distribute any of the above described Master Recordings of HOS.

(G).  **Publishing Administration Agreements.** All of HOS's rights under agreements made in the name of Liminal Music and Superliminal Music, including agreements with the composers or publishers of musical compositions contained in or related to the HOS Master Recordings and otherwise, and agreements with performing rights societies (such as BMI with respect to Liminal Music agreements and ASCAP with respect to Superliminal Music agreements), sub-publishers, sheet music

4                                      rev. 9/4/01

publishers, and mechanical and other licensees. "Liminal Music" and "Superliminal Music" are the only names which HOS has used in the conduct of its music publishing administration.

On the Closing Date, HOS will deliver to VE a signed written assignment and delegation of all of HOS' rights and obligations under each of the agreements referred to above in this Subsection 2(a)(iii) in the form attached hereto as Exhibit B, which VE agrees to execute on or before the Closing Date to evidence (i) its acceptance of the rights so assigned, (ii) its assumption of all of the obligations of HOS under each of such agreements as to which HOS has assigned rights to VE hereunder, and (iii) its obligation to protect, defend and hold HOS as well as its officers, agents, employees, officers and representatives harmless with respect to each and all of such assumed obligations.

(iv). **Distribution Accounts Receivable**. All of HOS's rights in accounts receivable owed to HOS and related to the HOS Master Recordings, as of the Closing Date, by HOS's distributors, customers, and accounts and subdistributors, including but not limited to DNA.

(v). **Advances to Artists**. All of HOS's rights to recover, from royalties payable to artists, composers, and licensors whose music is contained, under agreements, on any one or more of the HOS Master Recordings, those sums advanced by HOS to the said artists, composers, and licensors with regard to such music.

(vi). **Software for Record Keeping and Paying Royalties**. A series of FilemakerPro databases and scripts designed and programmed by HOS to calculate royalties payable on HOS' Master Recordings, and various databases and the information they contain relating to the Assets being transferred to VE hereunder. HOS reserves and shall have the continuing right, after the Closing Date (as defined in Section 7 below) to retain a copy of and use each of the materials described in this Subsection 2(a)(vi) for all purposes, including purposes unrelated to the Master Recordings sold hereunder.

(vii). **UCC Code Prefix**. All of HOS' rights to its UCC Code Prefix relating to the bar code used by HOS in connection with Record Devises embodying HOS Master Recordings.

The HOS Master Recordings and the additional rights and materials which are to be transferred to VE pursuant to the terms of this Agreement and are described in the foregoing subsections 2(a)(ii) through 2(a)(vii) are hereafter collectively referred to as the "Assets."

5

rev. 9/4/01

(b). **Asset Qualifications**. VE and HOS acknowledge and agree as follows with respect to the assignment by HOS of its rights under the Agreements identified in the foregoing Subsection 2(a):

(i). **Agreements as to which HOS' rights are Assigned**. The rights which HOS has agreed to assign to VE under this Agreement are all of its rights in and to those agreements listed in the attached Exhibits B-1, B-2, B-4 and B-5, excepting only those agreements identified on any one or more of such Exhibits as "Deleted." HOS's assignment to VE of each and all of its rights to agreements so marked "Deleted" are transferred to VE hereunder without any warranty of any kind whatsoever and without any representation that such rights exist or have any value whatsoever.

(ii). **Expired Agreements**. HOS has also agreed to assign to VE under this Agreement all of its rights in the agreements identified as "Expired" in either or both of the exhibits attached hereto as Exhibit B-1 and Exhibit B-4, as to which VE acknowledges that it is accepting such assigned rights under such agreements so marked "Expired" in their "AS IS" condition without any warranty of any kind from HOS with respect to such expired agreements.

(iii). **Consents to Assignment.** The agreements listed in the attached Exhibit B-3 require that HOS acquire the consent of the other party to the agreement to any assignment by HOS of any of its rights under such agreement. As of the date of this Agreement, HOS has not received the consents from the parties to the agreements identified in Exhibit B-3 as "Requested." With regard to each of the agreements as to which HOS has failed to obtain assignment consents as of the date of this Agreement, HOS and VE agree that HOS will not assign any of its rights under any of such agreements to VE (or anyone else) until HOS actually receives the required consent and that, upon HOS' actual receipt of each such required consent, HOS will immediately mail a copy of such consent to VE whereupon all of HOS' rights under such Artist Agreement will be deemed automatically assigned to VE and VE will be deemed to have automatically assumed each and all of HOS' obligations under such Artist Agreement.

(iv). **Claims and Defects.** The parties hereto acknowledge and agree that HOS has disclosed to VE various claims and defects that exist or are asserted with respect to some of the agreements as to which HOS is assigning its rights to VE hereunder. Such claims and defects are identified and summarized in the exhibits attached hereto as

6

Exhibits B-1, B-2, B-3, B-4, B-6 and B-7. VE acknowledges such claims and defects and accepts HOS' assignment of rights in and to such agreements subject to each and all of such claims and defects so disclosed and acknowledges that HOS' warranties in Section 19 below do not extend to or cover any of such defects or claims.

(c). **Property not included in the Assets being sold to VE hereunder.** The parties hereto acknowledge and agree that the Assets <u>do not</u> include any of the following:

(i). **Tradename.** The Assets do not include the trade name "Hearts of Space" or any other similar or dissimilar trade name owned or used by HOS, nor any of HOS's similar or dissimilar trade marks or service marks; and

(ii). **Deleted Masters.** The Assets do not include any of the HOS Master Recordings identified as "deleted" on the attached Exhibit A-2, except in so far as tracks from said deleted masters are being maintained, with the approval of artists or licensors, on HOS compilations or samplers.

3. **Purchase Price and Payments.** In consideration of the transfer of the Assets to VE by HOS, VE agrees to and shall provide HOS with the following consideration which is composed of the following, is in the form as set forth in the attached Exhibit C.

(a). **Cash.** VE agrees to and shall pay to HOS, by the Closing Date or September 1, 2001, whichever last occurs, the cash sum of approximately two hundred six thousand three hundred fifty three and 20/100 dollars ($206,353.20).

(b). **Recoupment Cash.** VE agrees to and shall pay to HOS in cash a sum equal to the total amount recouped and to be recouped by DNA from sales made by HOS through DNA prior to the Closing Date, such recoupment being made by DNA under the DNA - HOS Distribution Agreement in order to recover the $175,000 advanced to HOS by DNA when the DNA Distribution Agreement was signed. As of the date of this Agreement, the parties hereto agree that such sum will be $110,348.42 which VE agrees to and shall pay to HOS in three equal installments, the first of which shall be due on the first day of October, 2001, the second on the first day of November, 2001 and the third on the first day of December, 2001.

(c). **Returns Liability.** VE agrees to and shall assume, as of the Closing Date, all of HOS's returns liability associated with potential returns of

rev. 9/4/01

unsold Record Devices replicated from the HOS Master Recordings, including but not limited to all Record Devices shipped by or for the account of HOS to all channels such as but not limited to mainstream music, alternative market, and international accounts.

    **(d).   Royalty Obligations.**  VE agrees to and shall, from and after the Closing Date, assume and be solely responsible for all of HOS' royalty obligations associated with the HOS Master Recordings or Record Devices made therefrom, including but not in any way limited to (i) royalties to each artist whose performance in any way contributed to the content of any of the Master Recordings, (ii) royalties payable on third party licenses previously advanced to HOS, (iii) liquidation of royalty reserves for returns as the same becomes due (if ever), and (iv) publishing administration royalties payable (via Liminal and Superliminal).  Notwithstanding the foregoing provisions of this Section 3(d), the parties hereto agree that, as an accommodation to VE, HOS has paid that portion of royalties which are payable for the period ending June 30, 2001 and which are due for cash disbursement on August 29, 2001. Such royalties so paid by HOS total two hundred six thousand three hundred fifty three and 20/100 dollars ($206,353.20), which is the amount set forth in the foregoing Subsection 3(a).

    **(e)   Accounts Payable.**   VE agrees to and shall pay all manufacturing costs incurred by HOS and unpaid as of the Closing Date for the manufacture of copies of the Record Devices derived from HOS Master Recordings.  HOS estimates (but does not warrant) that such costs will total approximately $31,000 as of the Closing Date, plus fourth quarter manufacturing orders approved by VE.  VE agrees to and shall pay all such costs prior to delinquency directly to the persons entitled to payment. VE further agrees to and shall hold HOS harmless with respect to any and all claims resulting from or related to any and all such costs.

    **(f)   Specific Advances.**  VE agrees to and shall pay to HOS, on the Closing Date,  the sum of $20,000, which is the total amount HOS has advanced to David Darling for "Cello Blue" ($10,000) and to Rasa for "Union" ($10,000).

    **(g).   DNA Obligations.**  VE agrees to and shall on the Closing Date expressly assume each and all of HOS' obligations under the DNA Distribution Agreement.

**4.     Allocation of Purchase Price.**  The parties hereto agree that they have bargained for an allocation of the purchase price among the Assets in the manner set forth in the attached Exhibit D.  Each of the parties hereto further agrees to and shall report such allocation to the Internal Revenue Service on form

rev. 9/4/01

8594 and to all State and Local taxing entities to whom taxes are or may be payable with respect to the transaction evidenced by this Agreement.

**5.    Procedure for Payment of Purchase Price.**   On the Closing Date, the parties hereto agree that the full amount of the Purchase Price then payable shall be paid by VE to Robert E. Capron ("Capron") who shall hold the same as escrow agent pursuant to the Bulk Sale provisions of Division Six of the California Commercial Code ("Division Six") .

   **(a).    Disbursements.**   The parties hereto further agree that Capron shall, and is hereby instructed to, disburse the full amount of the Purchase Price after the Closing Date as required by and in accordance with the provisions of Division Six.

   **(b).    Costs.**   The parties hereto agree that all of the costs of complying with the provisions of Division Six shall be paid by Capron from the proceeds of the Purchase Price held and administered by Capron pursuant to the terms of this Section 5.  The parties hereto acknowledge and agree that such costs include, but are not limited to, court costs, filing fees, attorney fees incurred by Capron in commencing and maintaining any interpleader action which may become necessary in the course of complying with Division Six in the discharge of Capron's duties under this Agreement; Capron's time spent in acting as escrow agent pursuant to this Section 5 (such time to be compensated at the rate of $250 per hour).

   **(c).    Conflict.**   VE acknowledges that Capron is HOS' attorney and that he has represented HOS as its counsel in this transaction.  VE hereby acknowledges the conflict of interest that exists as a result of VE's appointment of Capron as escrow agent in this transaction, that VE has been advised concerning this conflict by VE's counsel, and that VE hereby consents to Capron acting as escrow agent in this transaction and waives any and all objections VE would otherwise have to Capron acting in such capacity.

By his signature below, Capron agrees to act and serve as escrow agent in this transaction under Division Six and the terms and provisions of this Section 5.

**6.    Fulfillment Services.**   VE agrees to and shall provide HOS with the following fulfillment services from and after the Closing Date.

   **(a).    HOS Online Store.**   VE agrees to provide fulfillment services for the HOS online store. VE agrees to fill, in a reasonable and prompt fashion, all orders of Record Devices by HOS on line customers, which Record Devices shall include and be limited to copies of HOS Master

9

rev. 9/4/01

Recordings and New Recordings marketed by VE under the trademark "Hearts of Space" or any other trademark which VE is licensed by HOS to use in connection with the marketing of copies of the HOS Master Recordings or any New Recording.

(i).   **Payment**.  HOS agrees that its customers shall make payment directly to VE for each Record Device copy of an HOS Master Recording or New Recording ("HOS Record Device Copy" hereafter) the customer may order for a price as advertised by HOS on line, which price shall not be less than $12.99 per compact disc.  With regard to each paid full price CD order of an HOS Record Device Copy so placed by an HOS on line customer with VE during any semi annual period, VE agrees to render an accounting to HOS and pay HOS $5.50 by the sixtieth calendar day following the end of such semi annual period.  Prices payable by VE to HOS for non CD Record Devices shall be commensurate with the foregoing prices payable for CDs.  As used herein, the term "non CD Record Devices" means and is limited to cassettes and to other similar as well as dissimilar configurations on which VE releases Phonorecords of HOS Master Recordings or New Recordings.

(ii).   **Semi Annual Period**.  As used in subsections (a) and (b) of this Section 6, "semi annual period" means half a calendar year, the first half being January through the immediately following June 30, and the second half being July 1 through the immediately following December 31. To illustrate the effect of the term "semi annual year" in this Subsection 6(a)(ii), VE shall be obligated to render an accounting to HOS by August 30 for all orders placed by HOS on line customers with VE between January 1 and June 30 immediately preceding such August 30, and VE shall be obligated to render an accounting to HOS by March 1 for all orders placed by HOS on line customers with VE between July 1 and December 31 immediately preceding such March 1.

(b).   **Premium Sales to Public Radio Stations**.  VE agrees to sell Record Devices direct to certain public radio stations designated by HOS. VE shall promptly fulfill orders from said public radio stations for such number of said Record Devices as said stations shall reasonably order from time to time after the Closing Date.  Such Record Devices shall be membership premiums and not for separate resale by the stations, and shall be sold by VE to the public broadcasting station designated by HOS for a price not to exceed $8.00 per CD.  For each such CD so sold by VE to a public broadcast station during any semi annual period (as that term is defined in the preceding Subsection 6(a)(ii)), VE agrees to and shall render an accounting to HOS and

rev. 9/4/01

pay HOS $1.50 by the sixtieth calendar day following the end of such semi annual period. Prices payable by the public radio stations for non CD Phonorecords shall be commensurate with the foregoing prices for CDs, as shall prices payable to HOS by VE for such non CD Record Devices.

**7.    Closing Date**. The Closing Date shall be the first business day after the occurrence of the last of the following conditions to occur, or such earlier date as may be agreed to in writing by HOS and VE.

**(a).    License Agreement**. VE and HOS have entered into a written license agreement authorizing VE to use HOS's trademarks as HOS and VE agree is necessary for the proper exploitation of the Assets by VE.

**(b).    Production Agreement**. VE and Stephen Hill enter into a Production Agreement for the production of New Recordings.

**(c).    DNA Assignment Consent**. DNA, a Division of Valley Media, Inc., a Delaware Corporation ("DNA"), gives its unqualified written and unconditional consent to the assignment and delegation by H O S to VE of all of HOS's rights and obligations under the Distribution Agreement between HOS and DNA, dated January 1, 2001 ("DNA Distribution Agreement") and expressly and unconditionally releases HOS, from and after the Closing Date, of all of HOS' obligations under the DNA Distribution Agreement. VE and HOS agree that the form of agreement attached hereto as Exhibit E is appropriate to evidence the foregoing assignment, assumption and consent, and VE and HOS agree to execute the same.

If each of the foregoing conditions fails to occur by September 15, 2001, then either party hereto shall have the right, on ten days' prior written notice to the other, to terminate this Agreement. If either party hereto has the right to give such a notice to the other party hereto and does so, then upon such tenth day after the giving of such notice, this Agreement shall be and become null and void and neither party hereto shall have any further rights or obligations hereunder.

**8.    Compliance with HOS Agreements**. VE acknowledges that HOS has entered into royalty and other agreements ("Other Agreements" hereafter) with artists, producers, photographers, designers, illustrators, licensors, licensees and other persons concerning, _inter alia_, the exploitation of the HOS Master Recordings and related Artwork. VE agrees that its exploitation of the HOS Master Recordings and related Artwork is subject to and governed by such Other Agreements in addition to the terms and provisions of this Agreement.

**9.    Indemnity and Hold Harmless**. The parties hereto agree as follows

rev. 9/4/01

to the following undertakings:

(a).   **VE Undertaking**. VE agrees to and shall protect, defend and hold HOS harmless from and with respect to all obligations, damages, loss, claims, causes, causes of action, judgments and liabilities (including but not limited to all attorney fees and costs of suit which HOS may reasonably incur to its own attorney for its defense with respect to such obligations or to the claimant's attorney, or both) directly or indirectly arising with respect to any obligation VE has assumed in this Agreement, including but not limited to those obligations assumed by VE and set forth in subsections (b), (c), (d), (e), and (g) of Section 3 above.

(b).   **HOS Undertaking**.  HOS agrees to and shall protect, defend and hold VE harmless from and with respect to all obligations, damages, loss, claims, causes, causes of action, judgments and liabilities (including but not limited to all attorney fees and costs of suit which VE may reasonably incur to its own attorney for its defense with respect to such obligations or to the claimant's attorney, or both) directly or indirectly arising with respect to any breach by HOS of any warranties it has given to VE in this Agreement.

10.   **Accountings**.   VE agrees that each accounting it is obligated to render under this Agreement shall be truthful, complete and fair and shall be prepared in accordance with generally accepted accounting principles consistently applied in the music industry in the United States of America.  VE further agrees that HOS shall have access during normal business hours to VE's books and records and to conduct an audit thereof in order to verify the accuracy and completeness of such of VE's accountings hereunder as HOS shall elect to verify from time to time.  Each such audit (i) shall be conducted during normal business hours, (ii) at VE's offices, (iii) by a certified public accountant or other qualified representative chosen by HOS, (iv) on a date chosen by HOS and set forth in a written notice given by HOS to VE at least seven calendar days before such audit date.  The cost of each such audit shall be borne by HOS unless such audit discloses that payments made by VE to HOS under this Agreement for the period of the audit were more than ten percent (10%) less than the sums actually due HOS under this Agreement for such audit period, in which event VE shall pay HOS in cash the full cost of such audit. HOS agrees to provide VE with a copy of such audit after the same is completed and, within seven calendar days after such audit report is given by HOS to VE,  VE agrees to and shall pay to HOS all sums shown as due in such audit report, together with the costs of such audit if VE is liable for such costs under the foregoing terms of this Section 10.  All sums due hereunder and not paid by such seventh calendar day shall bear interest at the rate of seven percent (7%) per annum from such seventh day and until such sums are paid in full.  If any such audit should show that VE had paid more than the sums due HOS hereunder for the period covered by the audit, such overage shall be credited against amounts next coming due hereunder

12

rev. 9/4/01

from VE to HOS. In no event shall HOS have any right (a) to conduct any audit hereunder more frequently than once every year, or (b) to conduct an audit any of VE's sales or other activities which occurred more than three years before the date such audit commences.

     **11.**   **Notices.**  All notices to be given under this Agreement shall be in writing and sent by (a) certified mail, return receipt requested, in which case notice shall be deemed delivered three (3) business days after deposit, postage prepaid in with the U.S. Postal Service, (b) a nationally recognized overnight courier, in which case notice shall be deemed delivered one (1) business day after deposit with the courier, or (2) telecopy or similar means if a copy of the notice is also sent by United States Certified Mail, in which case notice shall be deemed delivered on transmittal by telecopier or other similar means, provided that a transmission report is generated by reflecting the accurate transmission of the notices, as follows:

| | |
|---|---|
| If to HOS: | Hearts of Space |
| | One Harbor Drive |
| | Suite 107 |
| | Sausalito, CA. 94965 |
| With a courtesy copy to: | Robert E. Capron |
| | 214 Grant Avenue, Suite 400 |
| | San Francisco, CA 94108 |
| | |
| If to VE: | Valley Entertainment, Inc. |
| | 1807 Second Street |
| | Santa Fe, NM 87505 |
| | |
| With a courtesy copy to: | James D. Arnay, Esq. |
| | Epstein, Levinsohn, Bodine, |
| |    Hurwitz & Weinstein, LLP |
| | 1790 Broadway |
| | New York, NY 10019 |

These addresses may be changed by written notice to the other party, given as provided for above. Notwithstanding the foregoing provisions of this Section 11, VE shall have the right to send royalty statements to HOS by regular mail. Royalty statements given by regular mail to HOS by VE shall be deemed given to HOS on the third regular business day after the same have been deposited with the US Postal Service, postage prepaid, and addressed to HOS in accordance with the provisions of this Section 11.

     **12.**   **Entire Agreement.**  This Agreement (including all attached exhibits) and constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations,

rev. 9/4/01

both written and oral, between the parties with respect to the subject matter hereof.

**13.    Extension of Rights.** All rights and obligations created or incurred hereunder by VE or HOS shall extend to and be binding upon their respective successors, assigns, domestic and international divisions, subsidiaries, other controlled companies, affiliates and related entities.

**14.    Waivers.** No waiver or any breach of covenant or provision in this Agreement shall be deemed a waiver of any other covenant or provision in this Agreement, and no waiver shall be valid unless in writing and executed by the waiving party. No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act.

**15.    Disclaimer of Agency, Partnership and Joint Venture.** Nothing in this Agreement shall constitute or be deemed to constitute a partnership or joint venture between the parties hereto or constitute or be deemed to constitute any party the agent or employee of the other party for any purpose whatsoever and neither party shall have authority or power to bind the other or to contract in the name of, or create a liability against, the other in any way or for any purpose.

**16.    Severability.** If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not render the entire Agreement invalid. Rather, the Agreement shall be construed as if not containing the particular invalid or unenforceable provision, and the rights and obligations of each party shall be construed and enforced accordingly.

**17.    Governing Law.** This Agreement shall be construed in accordance with and governed by the law of the State of California without reference to California's conflict of law principles.

**18.    Interpretation.** Each of the parties hereto acknowledges and represents that it has been represented and advised by its own legal counsel in the negotiation of this Agreement. Accordingly, the parties hereto agree that this Agreement shall be interpreted and construed in accordance with its fair meaning and that any rule of construction which provides that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement.

**19.    HOS Warranties.** HOS warrants that each of the following are true and correct as of the date of this Agreement, and will be true and correct on the Closing Date:

**(a).    Good Standing.** HOS is a presently existing corporation duly incorporated and in good standing under the laws of the State of California and has the full power and authority under California law to enter into and

14                                              rev. 9/4/01

execute contracts such as this Agreement;

(b).  **Standstill.**  HOS represents and agrees that, between the date of this Agreement and September 15, 2001, it will not engage in any discussions or negotiations with any person or persons other than VE relating to or for the sale of any of the Assets which are the subject of this Agreement and are to be conveyed to VE on the Closing Date;

(c).  **Sales Report Records.**  The HOS sales report records which representatives of VE have studied and reviewed, accurately set forth the sales experience of HOS with respect to the HOS Master Recordings and derivative Phonorecords and Record Devices for the time periods set forth in such sales report records;

(d).  **Contracts.**  That, except to the extent provided to the contrary elsewhere in this Agreement or in any of the Exhibits attached to it or in any written information given by HOS to VE prior to the Closing Date,

(i).  **No Assignment.**  HOS has not made any assignment to any person of HOS' rights ("Contract Rights") under any of the contracts ("Contracts") which are listed on the attached Exhibit B-1 or B-2 A which in any way would impair the HOS Contract Rights which are being transferred by HOS to VE under this Agreement;

(ii).  **Payments.**  HOS has paid all royalties which it is required to pay under the terms and conditions of the Contracts as of the date of this Agreement;

(iii).  **No Default.**  HOS has not committed an uncured and unwaived material default under any of the Contracts as of the date of this Agreement;

(iv).  **Contract Terms.**  Each of the Contracts is enforceable per its written terms;

(v).  **Title to Assets.**  Except to the extent provided to the contrary in Subsection 2(b) above and elsewhere in this Agreement, HOS has good, valid and merchantable title to the Assets, free and clear of all title defects or objections, liens, claims, setoffs, charges, pledges, or other encumbrances of any nature whatsoever, including without limitation: chattel or other mortgages, collateral security agreements, pledges, title imperfections, defects or objections, liens, security interests, conditional and installment sales agreements, charges, or restrictions or any nature;

15                                    rev. 9/4/01

(vi). **Litigation; Decrees**. There are no judicial or administrative actions, proceedings or investigations pending or threatened that question or could affect the validity of this Agreement or any action taken or to be taken by HOS in connection with this Agreement. Except as stated to the contrary in Subsection 2(b) above or Section 20 below or elsewhere in this Agreement or stated to the contrary in the attached Exhibits A-1, A-2 or B-1 through B-7 inclusive, there are no lawsuits, claims, administrative or other proceedings or investigations relating to the Assets pending or threatened, including, without limitation, (i) pending royalty claims, requests for audits, or pending audits and disputes or threats thereof against HOS, in connection with any Artist Agreement or other contract relating to the Assets, by any union, guild, mechanical collection society, publisher, the Harry Fox Agency, or otherwise, or (ii) judgments, orders or decrees of any governmental entity.

(vii). **Disclosure**. No representation or warranty by HOS contained in this Agreement, and no statement contained in any document, list, certificate or other instrument furnished by HOS to VE in connection with VE's pre Closing Date investigation of the transactions contemplated hereby contains any misstatement of a material fact, or fails to state any material fact necessary in order to make the statements herein or therein not misleading. HOS has disclosed to VE every fact which is presently known to HOS' current management and which reasonably could be expected to have a material adverse effect on the value of the Assets or any of the rights in the Assets herein granted to VE.

If HOS gives VE any written notice before the Closing Date which makes any material modification in any of the foregoing warranties contained in subsections 19(c) or 19(d) above, VE shall have a period of seven calendar days following the giving of such notice to terminate this Agreement. If VE gives no such termination notice within such seven day period, this Agreement shall remain in full force and effect, modified by each and all such matters as may appear in such notice.

20. **HOS Warranty Limitations**. The parties hereto acknowledge and agree that HOS' liability for any and all breaches of any one, several or all of the warranties contained in the foregoing Section 19, shall be and are limited as follows:

(a). **Time.** HOS shall have no obligation for any breach of any one or more of the warranties set forth in Section 19 above which arises or is first discovered on or after the second anniversary of the Closing Date.

16                                    rev. 9/4/01

**(b).    Third Party Action.** If prior to the second anniversary of the Closing Date any third party or parties assert any claim or claims (such as but not limited to a copyright infringement claim that one or more artists who are signatory to an Artist Agreement as to which HOS is assigning its rights to VE hereunder has unlawfully copied or otherwise violated the rights of such complaining third party) which, if true, would constitute a breach by HOS of any of its warranties set forth in Section 19 above, then and in such event VE agrees to and shall resist such claims to the extent it is reasonable so to do and shall also proceed, promptly and reasonably, to recover its losses from any and all culpable party or parties other than HOS (such as the infringing artist in the foregoing parenthetical hypothetical) before seeking any relief from HOS. The full amount so recovered plus all additional sums reasonably and foreseeably recoverable by VE from such wrongdoing party or parties shall be credited against any legally recoverable damages VE actually suffers as a result of such breach of warranty and such sums shall be credited against the damages for which HOS is liable under this Agreement. VE agrees to and shall refrain from attempting to collect any such damages from HOS until VE has complied with the provisions of this Subsection 20(b).

**(c). Materiality.** The parties hereto acknowledge and agree that HOS shall have no liability of any kind whatsoever for any non material breach of any of the warranties set forth in Section 19 above. HOS shall be liable only for a material breach of any of the foregoing warranties, and such liability shall be and is limited by each and every one of the subsections of this Section 20.

**(d).    Amount Limit.** The total aggregate amount of HOS' liability for the breach of the warranties contained in Section 19 above shall be one hundred fifty thousand ($150,0000) dollars. The parties hereto acknowledge and agree that this $150,000 limit in not a per occurrence limit; it is an aggregate limit such that, if the warranties set out in Section 19 above were breached by seven different events prior to the second anniversary of the Closing Date, HOS' total aggregate liability could not in any event exceed $150,000.

**(e).    Source of Liability Payment.** If a material breach of any one or more of HOS' warranties set forth in Section 19 above occurs prior to the second anniversary of the Closing Date and causes VE to suffer damages in a sum greater than the total amount of all judgments VE is awarded against a third party or parties referred to in Subsection 20 (b) above, plus all sums payable to VE under settlements reached or to be reached with such third party or parties, plus all sums VE has recovered and can reasonably foreseeably recover from such third party or parties, then and in such event the sole source of payment of the amount of such damages in excess of the

17

total amount of such judgments, settlements and recoveries (which excess can in no event can exceed the aggregate amount of $150,000 as above stated) shall be the fees ("License Fees and Back End Fees") otherwise thereafter payable to HOS pursuant to the provisions of Subsection 5(a) and 5(b) of that certain Trademark License Agreement between VE and HOS of even date herewith. In no event shall HOS have any liability for any breach of one or more of the warranties set forth in Section 19 above beyond the limits set forth above in this Section 20.

21. **Koch Warranty and Hold Harmless**. HOS represents and warrants to VE that, as of the Closing Date, Koch International LP ("Koch") does not hold any inventory of any Phonorecords made from any HOS Master Recordings. If HOS hereafter commences any legal proceedings against Koch with respect to any claims which HOS believes it has and which it believes arise under or with respect to the Koch Agreement, or if Koch hereafter commences any legal proceedings against HOS with respect to any claims which HOS believes it has and which it believes arise under or with respect to the Koch Agreement, and if in any such proceedings Koch asserts any claims against VE which arise under or with respect to the Koch Agreement, then and in any such event HOS agrees to and shall protect, defend and hold VE harmless with respect to any and all of such claims so asserted hereafter by Koch against VE.

22. **HOS Representations**. The parties hereto acknowledge and agree that HOS has given VE access to HOS' books and records and VE has thoroughly investigated the same over a period of many days. VE accordingly acknowledges that, in proceeding with the transaction evidenced by this Agreement, it is doing so on its own and not in reliance on any projections or revenue estimates that HOS may have discussed with VE. Without in any way limiting the foregoing, VE acknowledges and agrees that HOS has not made and does not make any guaranties or warranties concerning (i) the sales revenue which VE will be able to generate with the Assets after the Closing Date, (ii) the amount of the advances on HOS' books which VE will be able to deduct from royalties payable in the future, (iii) the actual amount of returns VE may receive from HOS Master Recordings product previously sold by HOS, (iv) the amount of royalties which VE will be required to pay in the future, or (v) the amount of Accounts Receivable transferred to VE hereunder which VE will actually collect.

23. **Amendment of Agreement**. This Agreement can be amended only in a writing signed by each of the parties hereto.

24 **Time of the Essence.** Time is of the essence in this Agreement.

25. **Counterparts**. This Agreement may be executed in one or more counterparts. Each shall be deemed an original and all, taken together, shall

rev. 9/4/01

constitute one and the same instrument.

**26.    Attorney Fees.**    If either party hereto commences any legal or arbitration proceedings hereunder against the other party hereto to enforce the terms of this Agreement or collect damages for its breach or secure a declaration of rights and obligations hereunder or for any other relief, the party not prevailing in such action or proceedings agrees to and shall pay the prevailing party such prevailing party's reasonable attorney fees and costs of suit in addition to all other relief granted.

**27.    Construction.**    The singular form shall include plural, and vice versa. This Agreement shall not be construed as if it had been prepared by one of the parties, but rather as if both parties have prepared it.  Unless otherwise indicated, all references to sections are to this Agreement.  All exhibits referred to in this Agreement are attached to it and incorporated in it by this reference.

**28.    Paragraph Headings.**    Paragraph headings have been used in this Agreement for the purpose of convenience only and shall not be used in the interpretation or enforcement of this Agreement or the calculation or award of damages for its breach.

**29.    Further Assurances.**    Each of the parties hereto agrees to and shall execute such further documents and take such further acts as may be reasonably necessary to complete the documentation of the transaction evidenced by this Agreement and perfect the interests created or transferred hereunder by, for example, executing short form copyright assignments, suitable for recordation, relating to the rights assigned to VE hereunder.

**30.    Recitals True.**    The parties hereto acknowledge and agree that each and every matter set forth in the Recitals paragraphs above are true and correct.

WHEREFORE, the parties hereto have executed this Agreement as of the day and year first above written.

Valley Entertainment Inc.,                    Hearts of Space, Inc.

By:_____                    By_____
                                              Stephen Hill, as President


By: _____                    By_____
                                              Leyla Hill, as Secretary

19                                                          rev. 9/4/01

## ESCROW AGENT ACCEPTANCE

I agree to act as escrow agent and accept the responsibilities of that position as set forth in the provisions of Division Six of the California Commercial Code and Section 5 of the foregoing Records Asset Purchase and Sale Agreement dated September _____, 2001 by and between Hearts of Space, Inc., a California Corporation and Valley Entertainment Inc., a Delaware Corporation.

Dated: September 6, 2001

Robert E. Capron

20                                                    rev. 9/4/01

FROM :                              FAX NO. :                    May. 19 2008 01:54PM  P1

*[handwritten notes, illegible]*

**Valley Entertainment** Master Recording License Agreement Renewal

Today, *[illegible]* when entering into 2008 by and between the Parties Raphael above cited and

Whereas Raphael and Hearts or *[illegible]*, successor to Valley Entertainment, Inc., entered into an Agreement for an exclusive license of the Master Recording entitled "Music To Disappear In" as of the date of March 31st, 1988 and said Agreement has expired; and

Whereas Raphael and VE jointly and separately would like to extend the above-mentioned Agreement for a period ending December 31, 2009 and

Whereas Raphael and Valley Entertainment jointly and separately would like to keep all other terms and conditions from the Agreement dated March 31st, 1988 the same during the contract extension

Therefore, in mutual consideration of the foregoing and of mutual covenants and promises set forth in the Agreement dated March 31st, 1988, the parties, by their signature hereto, bind themselves to the terms and conditions of said Agreement for the period ending December 31, 2010.


For Raphael                          For Valley Entertainment, Inc.

*Raphael F. Sharpe*                  *[signature]*
                                     Jon Birge

*May 20 2008*                        *5/21/08*
Date:                                Date:

**CERTIFICATE OF COPYRIGHT REGISTRATION**



OFFICIAL SEAL

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

*[signature]*

REGISTER OF COPYRIGHTS
United States of America

**FORM PA**
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PAu    937-523

| PA | PAU |

EFFECTIVE DATE OF REGISTRATION

2 9 DEC 1986

| Month | Day | Year |

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.